## Case No. 15,527.

### UNITED STATES v. KERSHNER et al.

[1 Bond, 432.] 1

Circuit Court, S. D. Ohio. Feb. Term, 1861.

POSTMASTERS' ACCOUNTS—APPLICATION OF BALANCES—OFFICIAL BONDS—LIABILITY OF SURETIES—LIMITATION OF ACTIONS.

1. Where a postmaster in a quarterly return shows a balance in his hands, the postmaster-general may apply the balance reported in a subsequent return to the extinguishment of the previous balance

2. And where, in an account current continued for years, the postmaster-general thus makes the application of balances reported by a postmaster, any deficiency on final settlement due from the postmaster will be chargeable to and appear in the last quarterly account of the postmaster; and unless two years have elapsed from the return of the last quarterly account to the time of bringing suit on the postmaster's bond, the sureties in the bond are not protected from liability by the provision of the act of congress requiring suit to be brought within two years, or in case of neglect so to sue, the sureties not to be liable.

At law.

Stanley Matthews, U. S. Dist. Atty.

King & Thompson, for defendants.

LEAVITT, District Judge. This is an action of debt, brought by the United States against Isaac Kershner, as the principal, and William Mills and Elihu Thorn, as sureties, in the official bond of said Kershner, as the late postmaster at Yellow Springs, in this state. The breach assigned is the non-payment by Kershner of the sum of $499.35, which, it is averred, he owes the United States for moneys officially received by him. Kershner does not appear or make any defense to the action; but his sureties, Mills and Thorn, have pleaded, first, the general issue; and secondly, a special plea, in which it is averred that Kershner, as postmaster, "was at all times for more than two years next before the commencement of this action, in default in not accounting for and paying over to the plaintiff the moneys found due and owing from him as such postmaster, agent, and depository of the post-office department." The plaintiff takes issue on the last-named plea, by a replication denying that the default of Kershner, as postmaster, occurred two years before the institution of this suit.

The only evidence in the case is a duly certified transcript from the books of the auditor of the post-office department, showing the state of the postmaster's account, and exhibiting a balance of $499.35 due from him on

1 [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

March 31, 1859, at which date the account closed and the balance was struck. The first item of charge against Kershner in this account is for a balance due for the quarter ending June 30, 1853; and from that date he is regularly charged with the quarterly balances accruing against him until December 31, 1858, which is the last date in the debit side of the account. The account is carried on continuously from the date of the first entry to the close of the account, when the balance was finally ascertained. The credit side of the account is made up of various sums paid by the postmaster between September 22, 1855, and March 31, 1859. On the part of the sureties, it is insisted that the account current shows that Kershner was in default for a part of the quarterly balances charged against him as postmaster for two years or more prior to the commencement of this suit; and that by the neglect of the postmaster-general to bring suit for such balances within two years after they accrued, the sureties are released from their liability. They rely on sections 31 and 3 of the act of congress of March 3, 1825 [4 Stat. 102], "to reduce into one the several acts establishing and regulating the post-office department." Section 31 makes it the duty of a postmaster to render his accounts, and pay over to the postmaster-general the balance by him due, "at the end of every three months," and failing to do so the postmaster-general is required to bring suit against him. And section 3 of said act, after making it the duty of the postmaster-general to take bond, with approved security, from the postmaster, contains the following proviso: "That if the default shall be made by the postmaster aforesaid at any time, and the postmaster-general shall fail to institute suit against such postmaster and said sureties for two years from and after such default shall be made, then and in that case the said sureties shall not be held liable to the United States, nor shall suit be instituted against them."

The only question in this case arises on the construction to be given to the proviso just quoted. And this involves the inquiry, at what period is the postmaster to be regarded as in default. The present suit was instituted on January 3, 1860; and it is insisted by the district attorney, that as the account current between the United States and the postmaster exhibits an unbroken series of charges against, and credits to, the postmaster from the date of the first item to the close of the account when the final balance was struck, each payment made by the postmaster in the order of time in which it was made, is to be applied to the extinguishment of the preceding quarterly balance against him, and the residue, if any, to be credited to the account of receipts for the quarter within which the payment was made. Upon this principle, it will be readily seen that where a payment is made, sufficient in amount to satisfy a prior quarterly balance against the postmaster, the

default will be extinguished, and by the operation of this principle the defaults will all be thrown on the last quarter of the account. And hence it will result, that unless the default appearing in the last quarter of the account is of two years' standing, the sureties can not claim the protection of the statute.

On the other hand, it is contended that the legal liability of the postmaster for any quarterly balance against him accrued at the expiration of the quarter; and, that if during the period included in the account current, two years or more elapsed between the reported quarterly balance and the date of the next payment, the statute applies, and the sureties are exonerated. An inspection of this account shows clearly on what principle it was kept by the post-office department. It exhibits continuous items of charge and credit during the whole official term of the postmaster, the balance showing the whole amount of the deficit when he ceased to hold the office. And in accordance with the construction given to the statute by the post-office department and its established usage in keeping its accounts with postmasters, sureties have not been regarded as exonerated from liability, unless two years or "more had elapsed after the ascertainment of such balance before it was claimed by suit." The mode of keeping the accounts of postmasters and the principle on which the liability of sureties is to be tested, now insisted on as required by a just construction of the statute, would not only result in great practical inconvenience, but in the loss of large sums due the government for which sureties are liable in good faith and according to their legal obligations.

But, clearly, the statute does not require a construction which will lead to these results. In no proper sense of the term does it appear, from the account now before the court, that the postmaster was in default for two years prior to the commencement of this suit. It is true an inspection of the account shows, that as to the first item of charge, being a balance of $10.91 for the quarter ending June 30, 1853, it was not liquidated until September 22, 1855, being a period of more than two years; but it was fully discharged on that day, together with all the quarterly intermediate receipts charged to the postmaster. This default being thus extinguished, the sureties can claim no protection from liability on that account. For the eight quarters succeeding September 22, 1855, the quarterly deficits were small, and were fully extinguished by the credits to the postmaster during the years 1857 and 1858. It appears, however, that after applying the quarterly receipts with which the postmaster was charged for the year 1858, and a part of the year 1859, and extinguishing all the previous deficits, there was a balance against the postmaster on March 31, 1859, of four hundred and ninety-nine dollars and thirty-five cents, which is claimed in this action. But, as this suit

was commenced on January 1, 1860, it is apparent that two years had not elapsed after the occurrence of the default before suit brought; and, as a consequence, the statute which is relied upon by the sureties of the postmaster, as their defense in this action, does not apply.

The case of Jones v. U. S., decided by the supreme court of the United States in 1849—7 How. [48 U. S.] 681—is decisive of the question now before this court. That was a suit against a surety in the official bond of a postmaster, who set up in a special plea, as his defense, that sundry defaults were made by the postmaster in failing to pay over money received by him while in office, which were permitted to remain unclaimed by suit for more than two years. On the trial of the case in the circuit court for the Eastern district of Virginia, the district attorney requested the court to instruct the jury in reference to the account between the United States and the postmaster, "that subsequently to any default at the end of a quarter, without any direction by him (the postmaster), or by the postmaster-general, as to the application of any payments by the postmaster, they should be applied in the first instance to extinguish each successive default in the order in which it fell due; and, if by such application of said payments, the jury shall believe from the evidence that all the defaults which occurred two years before the institution of the suit were extinguished within two years after the same were respectively committed, that the act of congress, which limits the institution of suits against the sureties of a postmaster to two years after the default of the principal, has no application to this case, and can not in any degree affect the plaintiff's right to recover in this action." This instruction was given by the court below, and affirmed by the supreme court as correct. In behalf of the sureties, instructions were asked in the court below, to the effect that payments made by the postmaster should be applied to satisfy charges against him for receipts during the quarter within which the payments were made; and that, if there were balances due for previous quarters, payments afterward made could not be applied to their extinguishment; and that if such balances were permitted to remain two years without being sued for, the sureties were discharged from all liability. These instructions, in the judgment of the supreme court, were properly refused by the court below.

It will thus be seen, that the case of Jones v. U. S. [supra], involved the precise question presented in this case. In that, as in this case, there was a continuous account between the post-office department and the postmaster, commencing with the first quarter of his official term and ending with his removal from office, showing the debits and credits in the order of time in which they

occurred, and exhibiting the final balance against the postmaster, for which suit was brought against him and his sureties within the period of two years In that case the court, after reviewing the numerous authorities on the subject of the appropriation of payments made by a debtor, distinctly affirm the decision in the case of Kirkpatrick v. U. S., 9 Wheat. [22 U. S.] 724, in which Judge Story affirms the law to be, "that the debtor has a right, if he pleases, to make the appropriation of payments; if he omits it, the creditor may make it; if both omit it, the law will apply the payments according to its own notions of justice. It is certainly too late for either party to claim a right to make an application after the controversy has arisen, and a fortiori at the time of the trial." And in the same case. the same learned judge further says, that "in long running accounts, where debits and credits are perpetually occurring and no balances otherwise adjusted than for the purpose of making rests, we are of opinion that payments ought to be applied to extinguish the debts according to the priority of time."

In the case before this court. there is no pretense that the postmaster in making payments gave any directions as to their application, and he must therefore be presumed to have concurred in the application made by the post-office department. And the payments were applied in strict conformity with the law as held by the supreme court. Now, it is apparent, that if section 3 of the act of 1825, before cited, is to receive the construction contended for by the counsel for the sureties in this case. it would not only interfere essentially with the prompt and efficient action of the post-office department, but would result greatly to the injury and annoyance not only of the principal in the official bond of the postmaster but also of the sureties. It would require the auditor of the department to state a formal balance against the postmaster at the end of each quarter. which could not be extinguished by payments subsequently made in the absence of special instructions so to apply them; and if no such instructions were given. and any of these quarterly balances remained unliquidated without suit, the effect would be to exonerate the sureties from liability for any part of the defalcation of the postmaster. Remarking upon such a construction of the statute, the supreme court say, in the case of Jones v. U. S., that it "would interpose in the way of a debtor obstructions to the voluntary payment of his own debt, and compel the creditor to resort to a reluctant. dilatory, and expensive litigation for its recovery;" and they say again: "We can not, therefore. approve an interpretation of the act of congress like that assumed in the defense, which would require that quarterly balances should at all events, and in opposition to

the will of the parties justly inferred from their conduct, remain open and unsatisfied, to become the subject of future contest." And in another part of their opinion the court, in reference to the mode of keeping these accounts adopted by the post-office department, say: "By this application (of payments subsequent to a quarterly balance) any balance which may have existed at the end of a previous quarter was extinguished and sometimes overpaid, and the account thus brought down to a final balance. To this mode of application no just objection can be perceived." And again: "The payments being made generally and without any appropriation by the debtors who were thus liable, it was the undoubted right of the creditor to apply them to any sums antecedently due."

In the conclusion of their opinion, the supreme court adopt the language of Judge Hopkinson, in the case of Postmaster-General v. Norvell [Case No. 11,310], which is very direct and explicit on the question under consideration. and is as follows: "The application of the moneys received in a subsequent quarter to the payment of the debt or balance antecedently due, being perfectly correct and lawful, it follows that no part of the default for which suit is brought accrued two years before; on the contrary, all the balances antecedent to the last quarter were extinguished by the successive payments, and the final balance falls on the last quarter."

Upon this construction of the act of congress, thus authoritatively given, it is apparent, in the account before the court, that there was no default of two years' standing prior to the commencement of this suit, and, consequently, that these defendants as sureties are not protected by the statute. Judgment is therefore rendered for the balance stated in the account, with interest from December 31, 1858.